IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**JONTA RAMSEY,**

    Plaintiff,

v.                                                                                    Civil Action No. **3:23CV796 (RCY)**

**SGT. RICHARDSON,** *et al.*,[1]

    Defendants.

**MEMORANDUM OPINION**

Jonta Ramsey, a former Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[2] The action proceeds on Ramsey's Particularized Complaint. ECF No. 10. The matter is before the Court on a Motion for Summary Judgment filed by Defendants Sgt. S. Richardson, Lt. T. Robinson, and Unit Manager S. Spruell ("Defendants"). ECF No. 18. The Court provided Ramsey with notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). ECF No. 21. Ramsey filed a Response. ECF No. 24. For the reasons stated below, the Motion for Summary Judgment will be GRANTED.

**I. SUMMARY OF ALLEGATIONS AND CLAIMS**

In his Particularized Complaint, Ramsey alleges the following:

1. On 8-14-2023 at Greensville prison, a fire broke out.
2. I was left in my cell while screaming for help for 20 to 30 minutes until Lt. Robinson came and took me to medical due to my breathing and wheezing.
3. Lt. Robinson then took me from medical and put me in the hole which is segregation.

---

[1] The original Defendant, Greensville Correctional Center, was not named in the Particularized Complaint. Therefore, the Clerk terminated Greensville Correctional Center as a party. The Court changes the caption to reflect the current Defendants.

[2] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, punctuation, and capitalization in quotations from the record. The Court omits any secondary citations in the quotations from the parties' submissions.

> 4. While I was in segregation, Unit Manager Spruell served me charges that were false documents that I never committed.
> 5. Again, while in segregation, I was not given sheets, pillow, or mattress for some days and sleeping on my bare back with only 2 meals served my first day in seg.
> 6. Sgt. Richardson is responsible for these matters because she was working these shifts for the next couple of days.
> 7. On the 3rd day, I was transferred to Level 5 prison with no proper investigation done to prove my innocence and I was clearly a victim of a fire that I did not commit.
>
> CRUEL AND UNUSUAL PUNISHMENT
>
> <u>Sgt. Richardson</u> is responsible for not supplying me what I'm guaranteed, which is sheets and mattress [and] to be sheltered and 3 meals a day.
>
> <u>Lt. Robinson</u> is responsible for placing me in the hole, "segregation," for no real reason after leaving medical for not being able to breathe.
>
> <u>Unit Manager Spruell, SE</u> is responsible for serving me charges that were false documents that I never committed and got me transferred to a security level 5 prison without doing a proper investigation first. I lost good time toward my sentence because of this.

ECF No. 10, at 1 (paragraph formatting altered from original). Ramsey asks for damages in the amount of $250,000. *Id.* The Court construes Ramsey to raise the following claims:

> Claim One: Defendant Richardson subjected Ramsey to cruel and unusual punishment in violation of the Eighth Amendment[3] by not providing him with sheets, a mattress, and three meals a day while he was housed in segregation.
>
> Claim Two: Defendant Robinson violated Ramsey's Eighth Amendment rights to be free from cruel and unusual punishment by placing him in segregation.
>
> Claim Three: Defendant Spruell violated Ramsey's Eighth Amendment rights to be free from cruel and unusual punishment by issuing false disciplinary charges against him.

---

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at 324 (internal quotation marks omitted).  When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial."  *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

Defendants ask the Court to dismiss Claims One and Two because Ramsey failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).  Because the exhaustion of administrative remedies is an affirmative defense, Defendants bear the burden of pleading and proving lack of exhaustion.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Defendants also argue that Claims Two and Three lack merit.  In support of the Motion for Summary Judgment, Defendants submitted:  (1) the affidavit of Defendant Spruell, ECF No. 19-1, at 1–6; (2) a copy of Virginia Department of Corrections ("VDOC") Operating Procedure 861.1, Offender Discipline, Institutions ("Operating Procedure § 861.1"), *id.* at 7–46; (3) copies of records for the two disciplinary charges Ramsey received, *id.* at 47–60; (4) the affidavit of B. Spring, the Assistant Warden at Greensville Correctional Center ("GCC"), ECF No. 19-2, at 1–; (5) VDOC Operating

3

Procedure 830.1, Institution Classification Management ("Operating Procedure § 830.1"), *id.* at 5–18; (6) a bed log and an Incident Report from August 14, 2023, *id.* at 19–21; (7) VDOC Operating Procedure 841.4, Restorative Housing Units ("Operating Procedure § 841.4") *id.* at 22–39; (8) records from Ramsey's Institutional Classification Authority Hearing, *id.* at 40–41; (9) the affidavit of Defendant Robinson, ECF No. 19-3, at 1–2; (10) the affidavit of A. Carroll, the Institutional Ombudsman at GCC, ECF No. 19-4, at 1–6; (11) VDOC Operating Procedure 866.1, Offender Grievance Procedure ("Operating Procedure § 866.1"), *id.* at 7–23; and, (12) copies of grievance material submitted by Ramsey, *id.* at 24–27. Ramsey has not submitted any evidence to support his claims, and he did not swear to the contents of his Particularized Complaint.

In light of the foregoing principles and submissions, the facts set forth below are established for the purposes of the pending Motion for Summary Judgment. All permissible inferences are drawn in favor of Ramsey.

### III. PERTINENT FACTS

**A. August 14, 2023 Fire Incident and Ramsey's Placement in RHU**

On August 14, 2023,[4] "staff observed inmates in Ramsey's cell beating on the door, inciting other inmates, and throwing objects that had been lit on fire onto the pod floor." ECF No. 19-2, at 2; *see* ECF No. 19-3, at 1. Defendant Robinson was notified by Officer Williams that inmate Campbell in Cell 222 was inciting a riot, was yelling and complaining about showers, and then was complaining that his cellmate, Ramsey, was sick because he could not breathe. ECF No. 19-3, at 1. Defendant Robinson arrived at the pod and went to cell 222 to speak with Campbell and Ramsey. *Id.* Defendant Robinson had the control booth open the cell door and she placed

---

[4] The cited affidavits mistakenly cite the wrong date. The incident clearly occurred on August 14, 2023. *See* ECF No. 19-1, at 48.

4

Ramsey in handcuffs and escorted him to the medical department. *Id.* at 1–2. Defendant Robinson stayed with Ramsey until he was cleared by medical staff. *Id.* at 2. Once he was cleared, Defendant Robinson attempted to take Ramsey back to his cell but because the incident was still being resolved, she was instructed by Warden Coleman to take Ramsey to the Restricted Housing Unit ("RHU"). *Id.* Defendant Robinson took Ramsey to the RHU and then returned to Ramsey's pod to escort the other inmates believed to have been involved in the incident to the RHU. *Id.*

Defendant Robinson's involvement with Ramsey was limited to speaking with him at his cell, escorting him to medical, and then taking him to the RHU. *Id.* Defendant Robinson did not make the decision to place Ramsey in the RHU, and once she had escorted him to the RHU, she had no further involvement. *Id.* Defendant Robinson was unaware of any complaints Ramsey had about the conditions in the RHU and was not involved in determining how long Ramsey would remain in the RHU or in the decision for him to be transferred to a different institution. *Id.*

**B. Disciplinary Charges from the Fire Incident**

    <u>1.  Charge No. GCC-2023-2676</u>

On August 15, 2023, Defendant Spruell lodged a disciplinary charge against Ramsey for "Inciting to Riot, Rioting or Acting in a Manner that Disrupt" Offense Code 103. ECF No. 19-1, at 48. The Disciplinary Offense Report stated that:

> On 8/14/2023, it was observed by Officer K Hicks that inmates in cell 222 were yelling and screaming for other inmates to beat on their doors so they could get out. In observing the vibration of the door [on the video footage], you could clearly see the door shaking as if being kicked or beaten on heavily. Cell 222 is occupied by inmates O. Campbell . . . and J. Ramsey . . . . The inmate is in direct violation of code offense 103 as he acted in a manner that disrupted the orderly operation of the institution therefore the charge is written.

*Id.* Assistant Warden Spring reviewed and approved the charge the same day. *Id.* On August 15, 2023, Sgt. Boone served the Disciplinary Offense Report on Ramsey, who refused to sign the form

to acknowledge that he was served with the charge and advised of his rights. *Id.* Sgt. Boone signed the form that same day certifying that he had served the charge and Ramsey refused to sign. *Id.* The hearing was originally scheduled for August 21, 2023. *Id.* Ramsey was provided with the opportunity to accept a Penalty Offer of $1.00, instead of having the disciplinary hearing, but he declined the offer and again refused to sign the Penalty Offer form. *Id.* at 49.

On August 22, 2023, Ramsey submitted two Inmate Request for Audio and Video Evidence forms, asking for "footage of supposed incident that occurred on 8/14/2023" that would "show[] that I was taken to medical at time of offense." ECF No. 19-1, at 50–51. Ramsey also submitted an undated Inmate Request for Evidence form requesting medical records to show he was in medical at the time of the incident, *id.* at 52, and a Witness Request Form requesting staff and inmate witnesses, *id.* at 53. However, the requests were denied, because according to policy, and as printed on the Disciplinary Offense Report, an offender must submit these request forms to the Hearings Officer within forty-eight hours of being served with the disciplinary charge. ECF No. 19-1, at 2.

The disciplinary hearing was rescheduled for October 5, 2023. ECF No. 19-1, at 2. Ramsey and Defendant Spruell were both at the hearing conducted by Unit Manager Walden. *Id.* Unit Manager Walden read the charge to Ramsey and noted that when Ramsey was served with the charge, Ramsey "refused to respond when asked if he would like to request a staff or offender to assist at his hearing, to request witness[es], to request documented evidence, or to waive the right to 24-hour preparation prior to the hearing." *Id.* at 3. Ramsey also agreed that he declined the $1.00 penalty offer. *Id.* Ramsey pled not guilty and was asked to explain what occurred on August 14, 2023. *Id.* "Ramsey said he was in his cell in HU1-200 when he noticed smoke coming through the vents, which he believed was coming from the 400 pod. Ramsey said that he could

not breathe and that his cellmate was at the cell door calling medical for him while he was sitting on the floor drinking water. An officer then came, shackled him, and took him to medical." *Id.* Ramsey asked the reporting officer how she could observe him beating on the door when she was not in the booth, and Defendant Spruell indicated "that this was observed on the MaxPro [video] footage." *Id.* Ramsey asked if the video showed that he was the one beating on the door, and Defendant Spruell "responded that the door of the cell [Ramsey] was assigned to . . . could be seen shaking and vibrating as if it was being kicked." *Id.* Ramsey stated that his cellmate was the person who was shaking the door and then indicated that he had no further questions. *Id.*

Defendant Spruell explained that after reviewing the MaxPro video footage, she "had observed that inmates in cell 222 were yelling and screaming for other inmates to beat on their doors so they can get out. [She] stated that footage showed the vibration of the door cell 222, which appeared like it was being kicked or beaten on heavily, and that this cell was occupied by inmates O. Campbell and J. Ramsey." *Id.* Unit Manager Walden then asked if Ramsey had any questions. *Id.* Ramsey asked if staff had his requests for evidence and witnesses or had the video footage in evidence. *Id.* Unit Manager Walden responded that his request had been noted on the record. *Id.* at 3–4. At the conclusion of the hearing, Unit Manager Walden found Ramsey guilty based on a preponderance of the evidence and imposed a fine of $15 as a penalty. *Id.* at 4, 47. Ramsey did not appeal this disciplinary conviction. *Id.* at 4.

2. Charge No. GCC-2023-2682

On August 15, 2023, Lieutenant Clark lodged a disciplinary charge against Ramsey for "'Setting a Fire Resulting in Actual Damage or Injury to Persons or Property.' (Offense Code 104)." ECF No. 19-1, at 4. In her report from August 14, 2023, Lt. Clark indicated that,

> "[a]fter viewing MaxPro [video footage] for an incident that occurred on 8/14/2023 . . . assistance was called in for HU1 200 pod for several inmates setting fires. It

7

> was observed that burning items were being thrown from cell 222 in the upper 200 pod of HU1 which is occupied by inmates J. Ramsey . . . and O. Campbell . . . neither admitted to throwing the objects out of the cell therefore the charge is written.

*Id.* at 57. Defendant Spruell reviewed and approved the charge the same day. *Id.* Sgt. Boone served the Disciplinary Offense Report on Ramsey who refused to sign the form to acknowledge that he was served with the charge and advised of his rights. *Id.* Sgt. Boone signed the form certifying that he had served the charge and Ramsey refused to sign. *Id.* The disciplinary hearing was originally scheduled for August 30, 2023. *Id.* Ramsey was provided with the opportunity to accept a Penalty Offer of $1.00, instead of having the disciplinary hearing, but he declined the offer and again refused to sign the Penalty Offer form. *Id.* at 58.

On August 22, 2023, Ramsey submitted an Inmate Request for Audio and Video Evidence form, asking for "footage of supposed incident that occurred" that would "show[] that I was taken to medical at time of offense." *Id.* at 59. However, the request was denied, because it was not submitted to the Hearings Officer within forty-eight hours of being served with the disciplinary charge as required by policy. *Id.* at 4–5.

On October 5, 2023, Unit Manager Walden conducted the disciplinary hearing for this charge. *Id.* at 5. During the hearing the charge was read to Ramsey. *Id.* Unit Manager Walden asked Ramsey to confirm the pod that he was in at the time of the incident, but Ramsey "stated he was in medical at the time of the incident, and that if there was no video footage, medical records, or evidence that he had requested, that he had nothing else to say." *Id.* Unit Manager Walden explained that when Ramsey was served with the charge, he "refused to respond when asked if he would like to request a staff or offender advisor to assist at his hearing, to request witness[es], to request documentary evidence, or to waive his right to 24-hour preparation time prior to the

8

hearing." *Id.* Unit Manager Walden also asked Ramsey if he declined the penalty offer and Ramsey confirmed that he had. *Id.*

Ramsey pled not guilty and was asked to explain what happened on August 14, 2023. *Id.* Ramsey stated, "that he was in medical at the time of the incident and that if there was no evidence that he requested for the hearing then he had nothing to say and he wished for an appeal." *Id.* Unit Manager Walden asked Ramsey if he had any questions for Lt. Clark and Ramsey stated that he had no questions. *Id.* Lt. Clark was asked to explain what occurred on August 14, 2023, and she noted "that upon review of the Maxpro footage, several inmates were observed setting fires and burnt items were observed being thrown from cell 222, which was occupied by J. Ramsey and O. Campbell." *Id.* Based on Lt. Clark's statement and the preponderance of the evidence, Unit Manager Walden found Ramsey guilty and imposed a penalty of $15. *Id.* at 5–6. Unit Manager Walden informed Ramsey of his right to appeal. *Id.* at 6. However, Ramsey did not appeal this disciplinary charge. *Id.*

Defendant Spruell avers that although she wrote the disciplinary charge for Case No. GCC-2023-2767 and was a witness in the hearing, and she approved the charge for Case No. GCC-2023-2682, "she did not make the determination of guilt in either case." *Id.*

### C. Grievance Procedure at the VDOC

Operating Procedure § 866.1 provides that all issues "are grievable except those pertaining to policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, State and Federal Court decisions, laws and regulations, and other matters beyond the control of the VDOC." ECF No. 19-4, at 2. Operating Procedure § 866.1 requires that, before submitting a Regular Grievance, the inmate must demonstrate that he or she attempted to resolve the issue through the informal complaint process. *See* Operating Procedure at § 866.1.I.D.1–4. "The first

step in in the informal complaint process is for the offender to discuss their issue with staff for a quick resolution." *Id*. at § 866.1.I.D.1. If the issue is not resolved verbally, the offender should submit a *Written Complaint*. *Id.* at § 866.1.I.D.2. Prison staff have fifteen days from receipt of the *Written Complaint* to provide an appropriate written response. *Id.* at § 866.1.II.B.4. "If the issue on the *Written Complaint* is not resolved to the satisfaction of the offender, or staff fail to provide a written response within 15 days, the offender may file a *Regular Grievance* . . . . The *Regular Grievance* must be placed in the Grievance Mailbox within 30 days of the original incident unless a more restrictive timeframe applies." *Id.* at § 866.1.I.D.4

### 1. Grievance Intake Procedure

Prior to review of the substance of a grievance, prison officials conduct an "intake" review of the grievance to assure that it meets the published criteria for acceptance. *Id.* at § 866.1.III.C.3-&4. "If the *Regular Grievance* does not meet the intake criteria, staff has two working days from receipt to complete the *Intake* section of the <u>*Regular Grievance*</u> [form], indicating the reason for rejection, and to return the *Regular Grievance* to the offender." *Id.* at § 866.1.III.C.4. "If the offender disagrees with the intake decision, the offender has five days to appeal the decision." *Id.* at § 866.1.III.C.5.

### 2. Grievance Review

If the grievance is accepted, within two working days, prison "staff must print and provide the *Grievance Receipt* to the offender as notification of acceptance." *Id.* at § 866.1.III.C.3. Once the grievance is accepted for review, the Institutional Ombudsman determines the proper course of investigation. *Id.* at § 866.1.III.D.1. "Within 30 days of issuance of the *Grievance Receipt*, each accepted grievance must be investigated, reviewed, completed, and the *Offender Grievance*

*Response – Level I* returned to the offender unless a continuance is authorized." *Id.* at § 866.1.III.F.2.(b).

### 3. Grievance Appeals

"The *Offender Grievance Response – Level I* includes a section for the offender to appeal their grievance response." *Id.* at § 866.1.IV.A. The appeal must be submitted within five days of *receipt* of the *Offender Grievance Response. Id.* at § 866.1.IV.B.2 (emphasis added). The appeal must contain the following: 1) "what piece (the response, the disposition, or the remedy) is being appealed;" 2) how the determination did not address the issue; 3) a suggested remedy; 4) a signature and a date of "the appeal section on the *Offender Grievance Response* – Level I." *See id.* § 866.1.IV.B.1. Depending on the issue in the grievance, the appeal is addressed by the Director of Offender Management Services, the Health Services Director, the Superintendent for Education, the Chief of Corrections Operations, or the Regional Administrator. *See id.* at § 866.1.IV.C.1.a–e. For most issues, the Level II appeal is the final level of review. ECF No. 21-7, at 3.

"The exhaustion requirement is met only when a *Regular Grievance* has been accepted into the grievance process and appealed without satisfactory resolution." *Id.* at § 866.1.V.B.

**D. Ramsey's Grievance Submissions**

On September 11, 2023, Ramsey submitted a Regular Grievance stating that he was wrongfully charged after the incident on August 14, 2023, and was transferred to security level 5. ECF No. 19-4, at 24. Ramsey claimed that he was in medical due to a fire that broke out in the building and the smoke triggered his asthma. *Id.* Ramsey indicated that the strike force team told him that he was not allowed back on the pod and he was sent "to the hole until they finished" but

11

"the next day [he] was transferred." *Id.*[5] At that point, he had not had his disciplinary hearing, and he complained that there had been no proper investigation, indicated that he was going to file a lawsuit, and asked to be transferred back to Level 2. *Id.* On September 19, 2023, the Regular Grievance was rejected at intake because Ramsey had not first used the informal complaint process and had not filed a Written Complaint first as required. *Id.* at 25. Ramsey did not appeal the intake decision. *Id.* at 5.

On September 21, 2023, a Written Complaint from Ramsey was received, in which he "state[d] that the day there was a fire, he was coming back to the unit from medica[l]. He was told by strike force he could not come in. He was sent to HU10." *Id.* at 26. Unit Manager Claiborne responded that "[t]his information should have been provided to you at your ICA Hearing." *Id.* Ramsey did not file a Regular Grievance relating to this Written Complaint. *Id.* at 5.

On November 3, 2023, Ramsey submitted a Written Complaint addressed to Hearing Officer King indicating that he "ha[d] not been given my appeal packet for my Greensville charges and the deadline for the 25 working days are up. What is the next step for me to do about this situation?" *Id.* at 27. On November 6, 2023, IHO King responded: "When I receive your appeal packet from GCC, it will be served on you and you can bring this point up in your appeal process. I have inquired to GCC about these appeal packets on 11/6/23." *Id.* Ramsey did not file a Regular Grievance relating to this Written Complaint. *Id.* at 5.

A. Carroll avers that Ramsey filed no other complaints or grievances regarding his claims. *Id.* With respect to Claim Two—that Ramsey was wrongly moved to the RHU—the only Regular Grievance he filed was rejected at intake and he did not appeal the intake decision. *Id.* Because

---

[5] A. Carroll, the Institutional Ombudsman at GCC, explains that although Ramsey had been transferred to Wallens Ridge State Prison at the time he submitted his grievance material, these materials were forwarded to the grievance office at GCC. ECF No. 19-4, at 4 n.1.

12

Ramsey did not file a Regular Grievance that was accepted at intake and appealed through all levels of review, Ramsey failed to exhaust his administrative remedies for this claim. *Id.* at 5–6. Ramsey filed no grievance material with respect to Claim One—that he was subjected to inhumane conditions in the RHU. *Id.* at 6. Therefore, Ramsey failed to exhaust his administrative remedies for this claim. *Id.*

## IV. EXHAUSTION ANALYSIS

The pertinent statute provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language "naturally requires a prisoner to exhaust the grievance procedures offered, whether or not the possible responses cover the specific relief the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 738 (2001). Generally, in order to satisfy the exhaustion requirement, an aggrieved party must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his or her action to court. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The Supreme Court has instructed that section 1997e(a) "requires proper exhaustion." *Id.* at 93. The Supreme Court explained that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules," *id.* at 90, "so that the agency addresses the issues on the merits," *id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). The applicable prison rules "define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Exhaustion is mandatory, and courts lack discretion to waive the exhaustion requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

The record reflects that Ramsey failed to exhaust his administrative remedies for Claims One and Two because he filed no grievance material with respect to Claim One and failed to file

anything other than a Regular Grievance for Claim Two. Accordingly, Claims One and Two will be DISMISSED WITHOUT PREJUDICE. *See Duncan v. Clarke*, No. 3:12CV482, 2015 WL 75256, at *9 (E.D. Va. Jan. 6, 2015) (explaining that "the normal remedy for a failure to exhaust under § 1997e(a) is dismissal without prejudice" (citing *Booth*, 532 U.S. at 735)).

## V. EIGHTH AMENDMENT ANALYSIS

In Claim Three, Ramsey contends that Defendant Spruell violated his Eighth Amendment right to be free from cruel and unusual punishment by issuing false disciplinary charges against him. In his statement of his claim, Ramsey contends, in sum: "Unit Manager Spruell, SE is responsible for serving me charges that were false documents that I never committed and got me transferred to a security level 5 prison without doing a proper investigation first. I lost good time toward my sentence because of this." ECF No. 10, at 1. As a preliminary matter, the evidence establishes that Defendant Spruell merely filed one disciplinary charge and served as a witness in the hearing, and then approved the second charge, and "she did not make the determination of guilt in either case." ECF No. 19-1, at 6.

The Eighth Amendment protects prisoners not only from inhumane methods of punishment, but also from inhumane conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To survive summary judgment, an inmate must demonstrate that (1) objectively, the deprivation suffered or harm inflicted was "sufficiently serious," and (2) subjectively, "the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Ramsey has not proffered evidence that he suffered any serious or significant physical or emotional injury from the disciplinary charges filed or approved by Defendant Spruell. Thus, Ramsey fails to explain how Defendant Spruell's actions would

implicate the Eighth Amendment's prohibition on cruel and unusual punishment. *See Allen v. Norvell*, No. 7:21-cv-00213, 2022 WL 4479225, at *5 (W.D. Va. Sept. 27, 2022) (citing *Reynolds v. Madden*, No. 21-CV-00955-BAS-RBB, 2022 WL 874966, at *10–11 (S.D. Cal. Mar. 24, 2022)). Accordingly, Claim Three will be DISMISSED as frivolous.[6]

## VI. CONCLUSION

The Motion for Summary Judgment (ECF No. 18) will be GRANTED. Claims One and Two will be DISMISSED WITHOUT PREJUDICE. Claim Three will be DISMISSED as frivolous. The action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

/s/ RCY

Roderick C. Young
United States District Judge

Date: June 20, 2025
Richmond, Virginia

---

[6] Moreover, "a false disciplinary charge cannot serve as the basis for a constitutional claim." *Cole v. Holloway*, 631 F. App'x 185, 186 (4th Cir. 2016) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). Although "there are exceptions to this rule," Ramsey puts forth no evidence that would show that any such exception applies here. *See id.* (citing *Surprenant v. Rivas*, 424 F.3d 5, 13–14 (1st Cir. 2005); *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989)). Therefore, "[a] prisoner does not have a constitutionally guaranteed immunity from being falsely accused" of a disciplinary charge. *See Carlton v. Jackson Cnty. Ct.*, No. 88-2255, 1989 WL 56525, at *1 (6th Cir. May 31, 1989) (citing *Freeman*, 808 F.2d at 951; *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). Instead, "the Constitution merely guarantees that prison inmates will 'not . . . be deprived of a protected liberty interest without due process of law.'" *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (alteration in original) (citation omitted) ("[T]he key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections guaranteed by the Fourteenth Amendment.").

Notably, Ramsey raised no Fourteenth Amendment due process claim in his Particularized Complaint. Nevertheless, even if he had, Ramsey has no liberty interest or property interest in avoiding a monetary fine or avoiding a transfer to a higher security prison. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) (citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)); *Knight v. Johnson*, No. 3:10CV648, 2011 WL4101664, at *4 (E.D. Va. Sept. 14, 2011); *See Pelletier v. Elam*, No. 1:20cv524 (TSE/MSN), 2021 WL 2545462, at *3 n.3 (E.D. Va. June 17, 2021) (no liberty or property interest in avoiding monetary fines). To the extent that Ramsey claims he "lost good time toward [his] sentence because of this," ECF No. 10, at 1, inmates only have a protected liberty interested in *vested* good time credits, *see Wolff v. McDonnell*, 418 U.S. 539, 560-61 (1974); *Puranda v. Hill*, No. 3:10CV733-HEH, 2012 WL 2311844, at *3 (E.D. Va. June 18, 2012) (citing *Sciolino v. City of Newport News*, 480 F.3d 642, 653 n.9 (4th Cir. 2007)), and there is "no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level." *Mills v. Holmes*, 95 F. Supp. 3d 924, 935 (E.D. Va. 2015) (quoting *West v. Angelone*, No. 98-6858, 1998 WL 746138, at *1 (4th Cir. Oct. 26, 1998)); *Puranda*, 2009 WL 3175629, at *5. Ramsey puts forth no evidence that he lost vested good time credits. Thus, even if he had raised a Fourteenth Amendment due process claim, he fails to demonstrate that he was deprived of a liberty interest triggering due process protections.